Samuel L. Linnet (ISB No. 9788)
sam@alturaslawgroup.com
ALTURAS LAW GROUP, PLLC
101 E Bullion St., Unit 2H
Hailey, ID 83333
(208) 788-6688

Peter C. Renn*
prenn@lambdalegal.org
Kell L. Olson*†
kolson@lambdalegal.org
Tara L. Borelli*†
tborelli@lambdalegal.org
Pelecanos*†
pelecanos@lambdalegal.org
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
800 South Figueroa St., Suite 1260
Los Angeles, CA 90017
†mailing address only
(213) 382-7600 (T) | (213) 402-2537 (F)

*Pro hac vice forthcoming

Attorneys for Plaintiffs

Katherine M. Forster*
katherine.forster@mto.com
Paul E. Martin*
paul.martin@mto.com
Abigail K. Bessler*
abigail.bessler@mto.com
Elizabeth Anastasi*
elizabeth.anastasi@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Ave., 50th Fl.
Los Angeles, CA 90071-3426
(213) 683-9100 (T) | (213) 687-3702 (F)

J. Max Rosen*
max.rosen@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Fl.
San Francisco, CA 94105-2907
(415) 512-4000 (T) | (415) 512-4077 (F)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ATLAS JONES and SOPHIE SMITH,<br><br>*Plaintiffs*,<br><br>vs.<br><br>DEBBIE CRITCHFIELD, in her official capacity as Idaho State Superintendent of Public Instruction; IDAHO STATE BOARD OF EDUCATION; LINDA CLARK, WILLIAM G. GILBERT JR., DAVID TURNBULL, SHAWN KEOUGH, KURT LIEBICH, CALLY J. ROACH, and CINDY SIDDOWAY, in their official capacities as members of the Idaho State Board of Education; BOISE STATE UNIVERSITY; JEREMIAH SHINN, in his official capacity as Interim President of Boise State University; | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

UNIVERSITY OF IDAHO; C. SCOTT
GREEN, in his official capacity as President of
University of Idaho,

     *Defendants*.

# COMPLAINT

1.     Plaintiff Atlas Jones[1] ("Atlas") is a 19-year-old rising college sophomore at Boise State University ("BSU"). Atlas is a transgender man. He transitioned to living as a male several years ago and has undergone medical treatment to bring his appearance into alignment with his identity.

2.     His freshman year, Atlas used restrooms consistent with his gender identity. That is, he used the men's restrooms on campus. He similarly used men's restrooms at Boise High School.[2] At no point has Atlas's use of men's restrooms caused any harm to anyone.

3.     Plaintiff Sophie Smith ("Sophie")[3] is a transgender woman. Sophie lives as a woman, is perceived by others to be a woman, and has used women's restrooms at the University of Idaho for years. Sophie's transgender status is not known to the wider University of Idaho ("U of I") community. Sophie's use of the women's restrooms has never caused harm to anyone.

---

[1] A different first name appears on Mr. Jones's legal identification documents. However, he is consistently known and recognized as Atlas Jones in his daily life, including on his school records and school identification card. Mr. Jones brings this lawsuit under his commonly used name.

[2] S.B. 1100, passed in 2023, would have prevented Atlas from using those restrooms, but as a result of judicial injunctions, it was never lawfully applied at Boise High School prior to Atlas's graduation.

[3] Sophie Smith is a pseudonym. She has filed a motion to proceed anonymously in this action.

4.     On April 1, 2025, Idaho's Governor signed into law Idaho House Bill 264 ("H.B. 264"). H.B. 264 will, among other provisions, exclude transgender people like Atlas and Sophie (collectively, "Plaintiffs") from using university restrooms aligned with their gender identity.

5.     H.B. 264, if not enjoined, will irreparably harm Plaintiffs by excluding them from the restrooms they have used without incident for years. It will stigmatize them for their transgender status, causing them mental and emotional distress and undermining their right to be treated equally. It will force them to choose between (a) using restrooms that do not align with their gender identity, which will inflict psychological harm and out them as transgender; (b) limiting themselves to the short supply of single-use restrooms on their respective campuses, which are stigmatizing to be forced to use exclusively and often found in inconvenient locations; or (c) avoiding use of restrooms on campus altogether, which would endanger their health and could adversely affect their academic endeavors.

6.     Idaho has no justification in barring Plaintiffs from using restrooms that align with their gender identity. During their time at their respective institutions, neither BSU nor U of I has had any categorical ban preventing transgender people like Plaintiffs from using restrooms that align with their gender identity. BSU and U of I's practice of allowing individuals on campus like Plaintiffs to use bathrooms aligning with their identities has not caused any harm, and it has allowed transgender people like Plaintiffs to complete their education and contribute to the campus community without discrimination, harassment, or opprobrium.

7.     H.B. 264, as applied to Plaintiffs' use of restrooms at their college campuses, violates the Equal Protection Clause of the United States Constitution and is unlawful under Title IX of the Education Amendments of 1972 and, as applied to Atlas, Title VII of the Civil

Rights Act of 1964. It also violates Plaintiffs' constitutional right to privacy—that is, to disclose their transgender status on their own terms. Plaintiffs thus seek an injunction to protect their right to continue using the restrooms aligning with their gender identity in peace.

## JURISDICTION AND VENUE

8.    This action arises under 42 U.S.C. § 1983 to redress the deprivation of rights secured by the United States Constitution under the color of state law, under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"), and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, ("Title VII").

9.    This court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under 42 U.S.C. § 1983, the Constitution of the United States, Title IX, and Title VII. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

10.    Venue lies in this District pursuant to 28 U.S.C. § 1391, as the Plaintiffs and Defendants are located in this District and a substantial part of the events or omissions giving rise to the action occurred in this District.

## PARTIES

11.    Atlas is a 19-year-old man and resident of Idaho who is enrolled as a student at BSU. Beginning this fall semester, Atlas will also be employed by BSU as a math tutor on campus. Because Atlas is transgender, H.B. 264 bars him from using men's restrooms in all campus buildings.

12.    Sophie is a transgender woman and resident of Idaho who has used women's restrooms at U of I for years with the permission of the school. Because Sophie is transgender, H.B. 264 bars her from using women's restrooms in all campus buildings.

13.    Defendant Debbie Critchfield is Superintendent of Public Instruction in Idaho. The Superintendent of Public Instruction is responsible for carrying out policies, procedures,

and duties authorized by law regarding educational matters, including over higher education institutions and including over the provisions of H.B. 264. Idaho Code § 33-125A. The Superintendent of Public Instruction is also a member of the Idaho State Board of Education. *Id.* § 33-102. She is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint. Superintendent Critchfield resides in Idaho. She is sued in her official capacity only.

14.     Defendant Idaho State Board of Education ("Board of Education") is Idaho's single governing body for public kindergarten through college education. Idaho Const. Art. IV § 2. The Board of Education is required to enforce state educational law, including H.B. 264. Idaho Code § 33-107(5)(a). It is an education program receiving federal financial assistance.

15.     Defendants Linda Clark, William G. Gilbert Jr., David Turnbull, Shawn Keough, Kurt Liebich, Cally J. Roach, and Cindy Siddoway are the individual members of the Idaho State Board of Education, who have responsibility for the general supervision of Idaho's state educational institutions and its public school system. Under Idaho Code § 33-107, the Board of Education and its members are empowered to supervise "all entities of public education," *id.* § 33-107(3), and to "[e]nforce the school laws of the state," *id.* § 33-107(5)(a), including H.B. 264. The Board of Education's members are each persons within the meaning of 42 U.S.C. § 1983 and act under color of state law as to the allegations in this complaint. All reside in Idaho and are sued in their official capacities only. Idaho's public university system is an education program receiving federal financial assistance.

16.     Defendant Boise State University is a public university located in Boise, Idaho, subject to H.B. 264's enforcement mandate. It is an education program receiving federal financial assistance.

17.     Defendant Jeremiah Shinn is the Interim President of Boise State University.  He is responsible for carrying out the policies of Boise State University, including BSU's compliance with H.B. 264.  He is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint.  He resides in Idaho and is sued in his official capacity only.

18.     Defendant University of Idaho is a public university located in Moscow, Idaho, subject to H.B. 264's enforcement mandate.  It is an education program receiving federal financial assistance.

19.     Defendant C. Scott Green is the President of the University of Idaho. He is responsible for carrying out the policies of the University of Idaho, including U of I's compliance with H.B. 264.  He is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this complaint.  He resides in Idaho and is sued in his official capacity only.

## FACTUAL ALLEGATIONS

**I.    Plaintiff Atlas Jones Is a 19-Year-Old Student Who Uses The Men's Restroom Consistent With His Gender Identity.**

20.     Plaintiff Atlas Jones is a 19-year-old college student who attends BSU and who will, as of this fall semester, be employed as a math tutor.  Atlas has lived his whole life in Idaho, and grew up near Twin Falls.  At BSU, he is following his passion for robotics and political science to study Engineering with a concentration in Public Policy.  He will be in his sophomore year in the 2025-26 academic year.

21.     Atlas is an employee of BSU within the meaning of 42 U.S.C. § 2000e(f). He filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 24, 2025, alleging that, by adhering to H.B. 264, BSU violates Title VII's prohibition against sex discrimination.

22.    Atlas is transgender.  That means that his "sex assigned at birth"—that is, the sex designation recorded on Atlas's birth certificate based on the appearance of external genitalia— is different from Atlas's gender identity.  "Gender identity" refers to a person's fundamental, deeply felt understanding of their own gender.  The majority of people possess a gender identity that matches their sex assigned at birth (this is called being "cisgender").  But people who are transgender have a consistent, persistent, and insistent understanding that their gender is different from the sex they were assigned at birth.  Atlas's sex assigned at birth was female. Atlas's gender identity is male.

23.    During eighth grade, Atlas began thinking a lot about his gender identity.  He knew he was not female, but he had not let anyone know he was transgender.  He decided that whatever discrimination he might face, it would be worth it for his well-being and happiness to be honest about who he was.  A year later, he came out as transgender to friends and family.

24.    During tenth grade, Atlas began using his chosen name (Atlas) and pronouns (he/him) and was able to use male-designated restrooms in high school.  His high school, Boise High School, had a longstanding policy of permitting transgender students to use restrooms that matched their gender identity, which was confirmed through "gender support plans."  Atlas never had any problems using male-designated restrooms in high school.  Not once did a student complain that Atlas's presence made them uncomfortable.  Not once was there ever any indication that Atlas made a single student feel unsafe.

25.    In July 2023, Idaho passed S.B. 1100, a law that purported to bar Atlas and transgender people like him from using restrooms that align with their gender identity in Idaho primary schools.  As a result of a temporary restraining order from this Court, and then an injunction pending appeal from the Ninth Circuit, S.B. 1100 was enjoined until Atlas graduated. Currently, Atlas lives as a man in his daily life, and he has received medical treatment to bring

his appearance in line with his identity, including hormone therapy that masculinized his body and deepened the sound of his voice.

26.    At BSU, Atlas has classes in many different buildings on campus because of BSU's broad graduation requirements and the interdisciplinary nature of his degree. He also makes use of the many amenities made available to students, which are spread out across campus. He spends about five hours per day or more on campus, often spending a full day on campus and booking a study room at the library to work on assignments with friends between classes.

27.    Consistent with longstanding practices at BSU that permit him to do so, Atlas has, for his entire time at BSU, used men's restrooms without any issue. While using men's restrooms, Atlas has never experienced any criticism, harassment, or any other problem from another person. He has not caused any problems—nor jeopardized the privacy, safety, or well-being of anyone. Like any student, Atlas's goal in using the restroom is to meet his basic needs, and get in and out with as little interaction as possible.

28.    At times, Atlas has also used single-user restrooms that are not designated by sex. But he does not want to be forced to use those exclusively. As noted below, those restrooms also do not exist in all buildings on campus—and even where they do exist, they are not always convenient to use.

## II.    Plaintiff Sophie Smith is a Transgender Woman Who Uses The Women's Restroom Consistent With Her Gender Identity.

29.    Plaintiff Sophie Smith is a transgender woman who resides in Idaho.

30.    Sophie lives as a woman and is perceived as a woman, but her transgender status is not widely known in Moscow or at U of I specifically.

31.    Sophie frequently uses the women's restrooms at U of I without incident. She does so with the permission of administrators, to whom she previously came out as transgender.

She always uses the stalls. Like everyone else, Sophie's goal in using the restroom is to meet her basic needs, and get in and out with as little interaction as possible.

III.    **BSU and U of I Have Followed a Longstanding Practice of Allowing Transgender People Like Plaintiffs to Use Restrooms That Match Their Gender Identity.**

32.     At multiple universities in Idaho, transgender students, faculty, staff, administrators, and visitors have long had the ability to access school restrooms matching their gender identity, pursuant to inclusive policies and practices. Collectively, these inclusive policies and practices have been part of the educational experience of tens of thousands of Idaho residents, cisgender and transgender alike, without causing harm.

33.     BSU and U of I are two such universities. In 2024, both schools were included in a list of at least 456 U.S. colleges and universities that highlighted gender-inclusive restrooms on their websites. *See* "Colleges and Universities that List Campus Gender-Inclusive Restrooms on Their Website," CampusPride (last updated July 26, 2024), https://www.campuspride.org/tpc/genderinclusiverestrooms.

34.     For example, although Atlas challenges only H.B. 264's application to restrooms in this action, BSU's inclusive policies have extended further than restrooms: the Student Recreation Center still states on its website that "[s]tudents may either use the locker room/changing room that aligns with their gender identity or with their sex assigned at birth," encouraging students to use the one "where they feel the most safe and comfortable." *See* "Rec Center Policies," Boise State University, https://www.boisestate.edu/recreation/about/rec-center-policies (last visited July 10, 2025).

35.     U of I has also implemented gender-inclusive policies permitting individuals on campus to use restrooms aligning with their gender identity. Its website still states that U of I seeks to "[e]xpand[] availability of all-gender restrooms on campus," and that it has worked to "support[] the need for more . . . gender inclusive restrooms" and also "allow transgender and

other students to use their preferred names" for U of I accounts.  *See* "Projects," University of

Idaho, https://www.uidaho.edu/student-affairs/ubuntu/projects (last visited July 24, 2025).

Under these policies, Sophie has been allowed to use the women's restrooms for years.

## IV.    The Idaho Legislature Enacts H.B. 264.

36.    On April 1, 2025, Idaho Governor Brad Little signed H.B. 264.  The law had an

effective date of July 1, 2025.  A copy of H.B. 264 is attached as Exhibit A.  H.B. 264 puts in

place a statewide ban in Idaho that excludes transgender people from restrooms and other sex-

separated facilities consistent with their gender identity in covered entities, including

correctional facilities, domestic violence shelters, juvenile correctional centers, and—relevant

here—public educational institutions like Idaho's public universities and community colleges.

H.B. 264, if it remains in effect at the beginning of the 2025-2026 school year, will prohibit

BSU and U of I from allowing Plaintiffs to continue using restrooms that align with their gender

identities and how they are perceived on campus.

37.    H.B. 264 provides that Idaho's public universities and community colleges "shall

designate each multi-occupancy restroom . . . for the exclusive use by either females or males"

and "[e]very restroom . . . that is designated for females or males shall only be used by members

of that sex."  Idaho Code § 67-9802(1)-(2).  It states: "No individual shall enter a restroom . . .

that is designated for females or males unless such individual is a member of that sex."  Idaho

Code § 67-9802(2).  By using the term "individual," H.B. 264 makes clear that its provisions

apply to anyone who would use university restrooms, including students, faculty, and others.

38.    "Sex," as defined elsewhere in Idaho's code, is defined to constitute "an

individual's biological sex, either male or female."  Idaho Code § 73-114(2)(n).  Under the

same code section, "male" is defined as "an individual who has, had, will have, or, but for a

developmental or genetic anomaly or historical accident, would have the reproductive system

that at some point produces, transports, and utilizes sperm for fertilization."  *Id.* (2)(g).

"Female" is defined as "an individual who has, had, will have, or, but for a developmental or

genetic anomaly or historical accident, would have the reproductive system that at some point

produces, transports, and utilizes eggs for fertilization."  *Id.* (2)(c).  The definition does not

account for a person's present-day sex characteristics.  Thus, as H.B. 264 defines "sex," a

transgender person is a member of the "sex" that is the opposite of their gender identity.

39.     In addition to imposing a statewide mandate, H.B. 264 also creates a private right

of action.  Any person who encounters someone of the "opposite sex" (defined to treat

transgender men as female, and transgender women as male) in a university restroom may bring

a civil action for declaratory and injunctive relief against the university, so long as the

university either (a) provided the person of the "opposite sex" permission to use that restroom,

or (b) failed to take "reasonable steps" to prohibit that person from using that restroom.  A

prevailing plaintiff may recover attorneys' fees.  Idaho Code § 67-9803(1), (3).

40.     H.B. 264 also lays out various exemptions where its provisions do not apply,

including permitting an "individual" to enter a "restroom . . . designated for the opposite sex" to

"provide coaching or athletic training" during athletic events.  Idaho Code § 67-9802(4)(g).

None of these exemptions provides transgender people with access to restrooms matching their

gender identity.

41.     H.B. 264 also requires that schools provide "reasonable accommodations" to any

"student or employee" who provides a written request detailing that they are "unable or

unwilling" to use the multi-occupancy restrooms designated for the person's "sex."  Idaho Code

§ 67-9802(6).  Such accommodations do not include access to a restroom "designated for use by

members of the opposite sex while persons of the opposite sex are present or could be present."

Idaho Code § 67-9802(6).

**V.    The Idaho Legislature Identifies No Evidence to Support Applying H.B. 264 to Transgender Students' and Faculty's Use of Restrooms.**

42.    On February 18, 2025, Representative Barbara Ehardt introduced H.B. 264— short-titled, "An Act Relating to Protecting the Privacy of Women"—in the Idaho House.  H.B. 264 was drafted by the Alliance Defending Freedom ("ADF"), an organization that advertises itself as "advocat[ing] for laws and precedents that promote human flourishing by recognizing the important differences between men and women and honoring God's design for marriage between one man and one woman."  *See* Alliance Defending Freedom, https://adflegal.org (under "Marriage & Family").  In presenting the bill at the February 21, 2025 House Judiciary, Rules, and Administrative Committee Hearing, Rep. Ehardt said that she believed "our laws in Idaho are becoming more clear as to what our values are."  Senator Brandon Shippy, who supported H.B. 264's passage, emphasized at a later March 26, 2025 Senate Hearing that "there is only male and female," which is "attested to in the word of God."  He continued: "So I think this legislation is in order, because some have not affirmed that in their practices or policies."

43.    H.B. 264's "Statement of Purpose" states that H.B. 264 will "continue Idaho's efforts to protect the rights of girls and women and their private spaces where they are most vulnerable" and "preserve order and dignity in restrooms . . . for girls and women in facilities where they have been traditionally afforded privacy and safety, including from acts of abuse, harassment, sexual assault, and violence committed by men."

44.    In the entire debate on H.B. 264, however, legislators identified no reported incidents in Idaho of transgender people committing acts of violence in public university or college restrooms.

45.    H.B. 264's Statement of Purpose purports to focus only on the safety and privacy of "girls and women"—with Rep. Ehardt even stating at the March 19, 2025 Senate State Affairs Committee Hearing that "nobody's gonna stop" a "woman who identifies as a man and

looks as a man" since "that's not where the threat is." Yet the bill equally imposes its provisions on restrooms "designated for . . . males."

46. There is no evidence that H.B. 264 serves any legitimate governmental purpose when applied to restrooms. Despite the prior adoption of inclusive policies and practices at universities in Idaho and nationwide, there has been no reliable evidence that such policies have caused harm to women and girls. Legislators even acknowledged this, calling H.B. 264—which states in Section 3 that an "emergency is . . . declared to exist"—a "preventative bill." *See* Remarks of Sen. Cindy Carlson, Senate Chambers (Mar. 26, 2025).

47. At the first hearing on H.B. 264 in the House Judiciary, Rules, and Administrative Committee, the debate opened with a question from Rep. John Gannon: "How many incidents last year in calendar year 2024 were there? And what is the source of documentation for those incidents?" In response, Rep. Ehardt laughed, joking that "anticipating that" Rep. Gannon would ask that question, she "decided not to research it." At the university level, she reported that "we're not finding that problem yet." In response to a follow-up asking for any documentation of the problem that the bill claims to address, she replied: "I did not bring any of that with me."

48. While Rep. Ehardt purported to introduce the bill to protect women and girls, no woman from the public testified in support of the statute. Many women—both transgender and cisgender —testified *against* the bill, arguing it would cause safety issues that do not currently exist in Idaho. One speaker testified that the bill would create a "climate of fear for all women, including cisgender women who don't conform to traditional gender norms." Multiple cisgender women testified to that issue, with one succinctly stating that the bill "leads to discrimination against women who appear more masculine or men who appear more feminine," since people may start to question their gender as well. One cisgender woman testified:

-13-

I'm tall, 5'11" with an athletic build. There's nothing I can do about that. When I grew up, I refused to wear dresses and refused to follow some of the other typical norms, like having a short haircut. It did not win me any popularity contests, but I certainly wasn't hurting anybody. Over the years, I've been subject to assumptions about my gender in public spaces like museums and malls. As a volleyball player at the College of Idaho, I got used to hearing some crowd scream "man" at me as a slur or use another variety of colorful homophobic slurs. If this bill passes and the rhetoric escalates, what's next? How long before I hear those same slurs on the street when I'm just walking along wearing a skirt? That already happens. And what if I'm questioned about my gender in a public university bathroom?

49.     Under similar laws in other states, cisgender women have been harassed or removed from restrooms for not looking feminine enough.  Police have even demanded identification to prove their sex—all to use the bathroom.  *See* German Lopez, "Women are getting harassed in bathrooms because of anti-transgender hysteria," Vox (May 19, 2016), https://www.vox.com/2016/5/18/11690234/women-bathrooms-harassment.

50.     Public testimony offered on H.B. 264 at the House committee hearing on February 21, 2025, and the Senate committee hearing on March 19, 2025, also pointed to the increased harassment and harm that transgender people will face as a result of the bill.  One transgender man who testified emphasized the effect this would have at BSU's campus in particular:

This bill impacts our universities and our community colleges. The heart of many of our communities, these campuses aren't just classrooms. They bring thousands of people together for sporting events, concerts, and conferences and more. And this bill tells every person in this state they can become the bathroom police. . . . I'm gonna ask you to imagine a scenario, a crowded football game at BSU, thousands of people, a few beers in, and me, this bearded man you see before you going into the bathroom the bill says I have to:  to the women's bathroom. What do you think happens next? How do you think women in the bathroom will respond? How do you think men in the bathroom will respond to me when they see me walk in that bathroom? This bill makes my life and the lives of people I love dearly less safe.

51.     When asked by another representative if a person who has "fully transitioned" and "as far as the world knows [is] female" would present a "greater threat to other women in a

bathroom by virtue of having once been born male than any other woman walking into a bathroom," Rep. Ehardt evaded the question. She responded that "[i]f somebody wants to be fine with" such a person being in the women's bathroom, "that is up to them." But, she said, "it is very presumptuous to assume that we as women have to be fine."

52.      Legislators also identified no evidence that allowing transgender people to use restrooms consistent with their gender identity would create privacy concerns. More generally, there is no evidence that transgender people are any more likely to unnecessarily expose themselves to others in restrooms than non-transgender people. To the contrary, Atlas and Sophie take steps to avoid drawing unnecessary attention to themselves and thereby reduce the risk of harassment. Restrooms also include stalls to ensure privacy.

## VI.    Excluding Plaintiffs from Restrooms Consistent with Their Gender Identity Will Cause Irreparable and Well-Documented Harms.

53.      Applying H.B. 264 to exclude Plaintiffs from using restrooms aligning with their gender identity serves no legitimate government purpose. It will, however, cause substantial harms.

54.      Under H.B. 264, Plaintiffs would be prohibited from using restrooms aligning with their gender identity. That would leave them with limited options: (1) use restrooms on campus that do not align with their gender identity, (2) use limited and inconvenient single-use restrooms, or (3) avoid using restrooms altogether. All of these options will cause them tremendous harm.

55.      Plaintiffs know the first option to be functionally impossible. Atlas is perceived as male, and Sophie as female; accordingly, it would make them and others feel uncomfortable if they were to use restrooms on campus that do not align with their gender identity. If Atlas were to use women's restrooms, he would be at risk of harassment and violence because

strangers would perceive that a man was using the women's restroom.  So too would Sophie, as strangers would perceive that a woman was using the men's restroom.

56.    There is extensive evidence that transgender men like Atlas experience harassment when they use women's restrooms.  One survey of over 90,000 transgender Americans found that 10% of transgender men were denied access to and/or verbally harassed in women's restrooms—a higher percentage than for transgender men who used restrooms aligning with their gender identity.  *See* Jody L. Herman et al., "Safety and Privacy in Public Restrooms," UCLA School of Law Williams Institute (Feb. 2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Bathroom-Access-Feb-2025.pdf.  A higher percentage of transgender women were also harassed or denied access when trying to use men's restrooms than when trying to use women's restrooms aligning with their gender identity.

57.    Using restrooms that do not align with their gender identity would also put Plaintiffs at risk of being exposed to their peers as transgender.  Neither Atlas nor Sophie is "out" as transgender to most people on campus, because they do not want to face unequal treatment and because it is generally irrelevant.

58.    Using restrooms that do not align with their gender identity would also damage Plaintiffs' mental health.  Atlas is male, and Sophie is female.  Like other transgender people, part of accepting and living as their gender identity involves social transition—that is, existing in all aspects of life as the gender that aligns with the individual's gender identity.  Excluding Plaintiffs from the restrooms aligning with their gender identity—whether to force Atlas to use women's restrooms and Sophie to use men's restrooms, or to force them to use single-occupancy restrooms—undermines Plaintiffs' social transition.  That can exacerbate gender dysphoria, the distress that can be associated with the incongruence between a person's sex-

assigned-at-birth and gender identity.  And more generally, it can lead to emotional, mental, and physical distress.

59.    The second option—limiting themselves to only single-use restrooms—would also cause Plaintiffs harm for myriad reasons.

60.    Take BSU for instance.  Most buildings at BSU lack single-use restrooms.  An interactive map on BSU's website shows a list of current single-user restrooms on campus (identified as campus amenities), available at: https://maps.boisestate.edu/?id=715.  The map lists 19 buildings on campus with single-user restrooms.  The vast majority of the campus' main buildings, by contrast, do not offer single-user restrooms—or offer very limited, inconvenient single-user restrooms.

61.    For example, Albertson's Library, where Atlas spends much of his time, has no gender-neutral, single-occupancy restroom available.  That library hosts "gatherings, exhibitions, and talks."  *See* "Reserve Rooms: Event Space," Boise State University, https://www.boisestate.edu/library/using-the-library/spaces.  Nor does the Hemingway Center, a "cultural and artistic hub on campus that supports a variety of Creative Writing programs, art performances, events, and educational experiences for students and the community."  *See* "Hemingway Center," Boise State University, https://www.boisestate.edu/hemingway.  Nor does the Special Event Center, a 435-seat "magnificent proscenium theater" that "sets the stage for a wide range of captivating performances, including dance, drama, opera, conferences, lectures, and film."  *See* "Special Event Center," Boise State University, https://www.boisestate.edu/studentunion/student-union-events/event-space/special-event-center.

62.    In some buildings that have single-user restrooms, those restrooms are woefully inadequate.  Albertsons Stadium, the home of BSU football that boasts an all-time attendance record of 37,771 fans in 2024, appears to have just one "single-use/family restroom" located on

the "upper west concourse . . . behind section 9 and section 10." *See* "Albertsons Stadium," Boise State Broncos, https://broncosports.com/facilities/albertsons-stadium/1; "Fan Guide 2024," Boise State Broncos, https://broncosports.com/sports/2024/8/19/fan-guide-2024.  And BSU's ExtraMile Arena, with a capacity of 13,390 seats, has just "3 family restrooms" for "those who need additional privacy beyond a single stall." *See* "About Us," ExtraMile Arena, https://www.extramilearena.com/connect-with-us/about-us; "A-Z Guide," ExtraMile Arena, https://www.extramilearena.com/plan-your-visit/a-z-guide.

63.     Relegating Atlas to these single-user restrooms would undermine his academic experience—creating serious obstacles to his ability to study, socialize, and engage in the school spirit his cisgender peers freely experience.

64.     Many buildings at U of I also lack single-user restrooms.  A since-deleted U of I website listed each of the buildings with single-use restrooms on campus. *See* Archive of "Gender-Inclusive Restrooms," University of Idaho (captured Dec. 19, 2024), https://web.archive.org/web/20241219144202/https://www.uidaho.edu/diversity/edu/lgbtqa/coming-out/gender-inclusive-restrooms.  That list pales in comparison to the total number of buildings on campus. *See* "Campus Directory Map," University of Idaho, https://www.uidaho.edu/-/media/UIdaho-Responsive/Files/division-of-finance-and-administration/budget-and-planning/aes/Maps/printable-campus-map.pdf.  There are no single-use restrooms in the building where Sophie spends the vast majority of her time on campus, so she would be forced to leave the building and go outside to find a single-user restroom, even in inclement weather.

65.     Aside from the non-existence or inconvenience of single-user restrooms, Plaintiffs would also feel stigmatized if forced to use single-user facilities, rather than be able to use restrooms aligning with their gender identity.  Consigning a transgender person to the use of

separate, single-user restrooms ostracizes and segregates them from their peers and community. It communicates a message of disapproval to both the person and the entire university community that their identity is not and should not be respected; that their presence in a restroom facility matching their gender identity represents a threat to others; and that transgender people must be separated from everyone else because of who they are. According to a 2022 UCLA Williams Institute study, more than a third of transgender people experience bullying, harassment or assault in higher education settings. H.B. 264 will cause more of these adverse experiences.

66.     Forcing Plaintiffs to use single-user facilities can also out them. For instance, were Atlas to attend a football game at Albertson's Stadium, others would likely notice if, instead of using a nearby men's restroom (which he would be prohibited from using), Atlas were to travel to the sole single-user facility. That would be all the more noticeable were he to walk to the restroom with his peers—and have to explain why he alone could not enter the facility that would appear appropriate for his gender identity. Sophie too would have to fully exit the building where she spends the majority of her time every time she needed the restroom, which would make her restroom use all the more noticeable and open her to questions about why she cannot simply use the women's restrooms in her building that she has used for years.

67.     Finally, the third option—foregoing regular restroom use—would endanger Plaintiffs' health and is therefore wholly unsuitable. Atlas, for instance, spends a significant amount of time on campus. He has historically been prone to urinary tract infections, and having regular access to restrooms is an important part of how he manages his symptoms and prevents reoccurrence of that condition. Similarly for Sophie, having to wait several hours to use a restroom off campus could be harmful. Studies show that restroom bans lead to avoidance—reported by over half of transgender adults in one large-scale survey—which causes

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

negative consequences for the person's health, including urinary tract infections and kidney infections, as well as an adverse impact on the ability to concentrate and access the benefits of education. *See* Jody L. Herman et al., "Safety and Privacy in Public Restrooms," UCLA School of Law Williams Institute (Feb. 2025), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Bathroom-Access-Feb-2025.pdf.

68.     The harms Plaintiffs face should H.B. 264 bar them from using restrooms aligning with their gender identity are well documented.  Experts in the mental and physical health of transgender people have repeatedly shown that restroom bans can have adverse mental and physical consequences for transgender people.  Those consequences include (1) harassment when using the supposedly "right" restroom; (2) involuntary disclosure that the person is transgender; (3) promotion of the view that there is something wrong with the transgender person, a view that can foster additional discrimination, harassment, and even violence; (4) negative health consequences caused when transgender people try to avoid going to the restroom; (5) impairment of learning in the educational environment; and (6) interference with the process of social transition.

69.     Given these harms, one study found that denial of access to bathrooms or gender-appropriate campus housing had a significant relationship to transgender college students' suicidality.  Kristie L. Seelman, "Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality," J. Homosex. 63(10): 1378-99 (Oct. 2016).  In light of these potential harms from singling out transgender people for worse treatment, the National Association of School Psychologists and the American School Counselor Association have called  upon schools to allow people who are transgender to use the same restrooms as their cisgender counterparts.

## COUNT I

## Violation of Equal Protection

## U.S. Const. Amend. XIV

*(Against Defendants Critchfield, Clark, Gilbert Jr., Turnbull, Keough, Liebich, Roach, Siddoway, Shinn, and Green)*

70.     Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

71.     Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief, and challenging H.B. 264 as applied to their ability to use restrooms aligning with their gender identity at BSU and U of I.

72.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Defendants are all governmental actors and/or employees acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

73.     H.B. 264 facially and intentionally discriminates against transgender people like Plaintiffs based on sex-related considerations. Discrimination based on sex includes but is not limited to discrimination based on gender nonconformity, gender identity, transgender status, gender transition, and nonconformity to sex-based stereotypes.

74.     H.B. 264 engages in sex-based classification by limiting access to campus restrooms based on sex assigned at birth: A man whose sex assigned at birth is female but whose gender identity is male—like Atlas—cannot use the men's restroom solely based on his sex. A cisgender man with a male gender identity, by contrast, would be permitted to do so— again, solely based on his sex. So too for transgender women like Sophie. A woman whose sex

assigned at birth is male but whose gender identity is female, like Sophie, cannot use the women's restroom solely based on her sex.  H.B. 264 also discriminates against transgender people based on sex by imposing harmful differential treatment on those who fail to conform to the stereotypes associated with their sex assigned at birth—that all people must have a gender identity that conforms with their sex assigned at birth, even though transgender people do not. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

75.      H.B. 264 also discriminates against transgender people like Plaintiffs based on their transgender status.  H.B. 264 classifies based on transgender status by prohibiting transgender people from using school restrooms that align with their gender identity, while permitting cisgender students to use school restrooms that align with their gender identity.  In other words, it treats people differently and worse solely based on whether their assigned sex at birth aligns with their gender identity: if it does, they may use the restrooms that correspond to their sex; if it does not, they may not.  That is discrimination on the basis of transgender status.

76.      Under the Equal Protection Clause of the Fourteenth Amendment, any discrimination based on transgender status is presumptively unconstitutional and subject to heightened scrutiny.  *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019); *Roe v. Critchfield,* 137 F.4th 912, 922 (9th Cir. 2025).  Government discrimination against transgender people bears all the indicia of a classification requiring heightened scrutiny by the courts: (a) transgender people have long been victims of extreme discrimination across the country, including in Idaho, and continue to suffer such discrimination to this day; (b) transgender status and gender identity bear no relation to one's ability to contribute to society; (c) transgender people are politically vulnerable to attack and lack sufficient power to protect their rights adequately through the legislative process, given that they have been and continue to be

regularly targeted by anti-transgender legislation, regulations, bills, and other government

action; and (d) gender identity, which is generally fixed at an early age and is immutable, is a

core, defining trait that is so fundamental to one's identity and conscience that a person cannot

be required to abandon it as a condition of equal treatment.

77.    H.B. 264's discrimination against transgender people based on sex and

transgender status fails every level of scrutiny.  It is not substantially related to an important

government interest.  It is not even rationally related to any legitimate government interest.

Universities across the nation, and previously in Idaho, have regularly allowed transgender

students to use restrooms that align with their gender identity without causing increased safety

or privacy problems for any students.

78.    H.B. 264's discrimination against Plaintiffs also specifically fails every level of

scrutiny.

79.    Far from advancing any interest in safety or privacy, H.B. 264 endangers the

safety, privacy, and well-being of transgender people like Plaintiffs.  For example, if Atlas were

forced to use women's restrooms, he would be exposed to a heightened risk of harassment and

assault by people who believe that he should not be in the women's restroom, even though that

is the facility aligned with his "sex" as defined by H.B. 264.  And if Sophie—who has been

perceived by others to be a woman for years—were forced to use the men's restroom, she

would also be exposed to a heightened risk of harassment and assault by men who believe she

should not be in the men's restroom.  Alternatively, forcing transgender people to use only

single-occupancy or other "reasonable accommodation" restrooms will stigmatize them as

"others," similarly exposing them to a heightened risk of harassment and assault and

jeopardizing their psychological health.

80.     In enacting H.B. 264's university provisions, the Legislature could point to no factual support showing the need for the bill or how it would meet its purported aims.  Rather than advancing any legitimate governmental interest, H.B. 264's requirement that transgender people use restrooms incongruent with their gender identity communicates the State's disapproval of their gender identity, which the Constitution and federal law protects, and the law is inexplicable by anything but animus.  This is invidious discrimination against Plaintiffs.

**COUNT II**

**Violation of Title IX**

**20 U.S.C. § 1681**

*(Against Defendants Idaho Board of Education, Boise State University, and University of Idaho)*

81.     Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

82.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a). Title IX's prohibitions on sex discrimination extend to "any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient" of federal funding.  34 C.F.R. § 106.31; 7 C.F.R. § 15a.400; 45 C.F.R. § 86.31.

83.     Under Title IX, discrimination "on the basis of sex" encompasses discrimination based on gender nonconformity, gender identity, transgender status, gender transition, and nonconformity to sex-based stereotypes.

84.     Conduct specifically prohibited under Title IX includes, *inter alia*, treating one person differently from another in determining whether such person satisfies any requirement or

condition for the provision of aid, benefits, or services; providing different aid, benefits, or services in a different manner; denying any person any such aid, benefit, or service; or otherwise subjecting any person to separate or different rules of behavior, sanctions, or other treatment.  34 C.F.R. § 106.31; 7 C.F.R. § 15a.31; 45 C.F.R. § 86.31.

85.    Boise State University and the University of Idaho are education programs receiving federal financial assistance.  This means that the academic, extracurricular, and other educational opportunities they provide are subject to Title IX's prohibitions on sex- and gender-based discrimination against any student or person on campus.

86.    By prohibiting transgender people like Plaintiffs from using the restrooms that match their gender identity, which their cisgender peers are allowed to use, Defendants will exclude Plaintiffs from participation in, deny them the benefits of, and subject them to discrimination in education programs and activities at their universities "on the basis of sex." This violates Plaintiffs' rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.  For example, Defendants violate Atlas's rights under Title IX by barring him from using the same men's restrooms that every other man is allowed to use and relegating him to separate restroom facilities.  And Defendants violate Sophie's rights under Title IX by barring her from using the same women's restrooms that every other woman is allowed to use and relegating her to separate restroom facilities.

87.    Defendants' violation of Plaintiffs' Title IX rights has caused injury and damage as a result, for which they seek nominal damages of $1 (only as to their Title IX claim).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

**COUNT III**

**Violation of Right to Privacy**

**U.S. Const. Amend. XIV**

*(Against Defendants Critchfield, Clark, Gilbert Jr., Turnbull, Keough, Liebich, Roach,*

*Siddoway, Shinn, and Green)*

88.    Plaintiffs reallege and incorporate by reference the allegations above as though fully set forth herein.

89.    Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief, and challenging Idaho's H.B. 264 as applied to their ability to use restrooms aligned with their gender identity.

90.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  Defendants are all governmental actors and/or employees acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

91.    The substantive protections of the Due Process Clause, as well as other constitutional provisions, give rise to a right to privacy, protecting information that is highly personal and intimate, which includes information that could lead to bodily harm upon disclosure.  Government infringement of these protections requires courts to apply strict scrutiny to such government action.

92.    The involuntary disclosure of a person's transgender status violates that person's fundamental right to privacy.  The fact that a person is transgender constitutes highly personal and intimate information.  A reasonable person would find the involuntary disclosure of one's transgender status to be deeply intrusive.

93.    The involuntary disclosure of one's transgender status can also cause significant harm, including placing one's personal safety and bodily integrity at risk.  This harm burdens and interferes with the ability of transgender persons to live in a manner consistent with their gender identity in all aspects of life, including where doing so is medically necessary.

94.    H.B. 264 violates the fundamental right to privacy of Plaintiffs Atlas Jones and Sophie Smith by causing the involuntary disclosure of their transgender status and by depriving them of significant control over the circumstances around such disclosure.

95.    There are no adequate safeguards to prevent the harms of the involuntary disclosure of one's transgender status caused by H.B. 264.  For example, once other students or community members learn of the fact that Plaintiffs are transgender, nothing prevents their disclosing that information to others.

96.    There is no compelling, important, or even legitimate interest in the government causing transgender people such as Plaintiffs to disclose their transgender status involuntarily any time they need to use university facilities.  There is also no public policy interest that is served by causing transgender people to disclose their transgender status to third parties when they would not otherwise do so.

## COUNT IV

### Violation of Title VII

### 42 U.S.C. § 2000e, *et seq.*

*(Plaintiff Atlas Jones against Defendant Boise State University)*

97.    Plaintiff Atlas Jones realleges and incorporates by reference the allegations above as though fully set forth herein.

98.    Title VII provides that it is "an unlawful employment practice for an employer" to "discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's . . . sex" or to "limit, segregate, or classify [its] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a).

99.     Under Title VII, discrimination "because of . . . sex" includes discrimination on the basis of gender nonconformity, gender identity, and transgender status.

100.    Defendant Boise State University is an "employer" within the meaning of Title VII. Beginning this fall semester, Atlas will be employed by BSU as a math tutor on campus.

101.    The enforcement of H.B. 264 by Defendant Boise State University constitutes sex discrimination against Atlas in violation of Title VII, by excluding him from consistent with his gender identity, which is a term, condition, and privilege of employment. This failure also limits, segregates, or classifies him in a way that deprives or tends to deprive him of employment opportunities or otherwise adversely affects his status as an employee.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that proper process issue and be served upon Defendants, requiring them to answer the Complaint within the time prescribed by law, and further Plaintiffs request an order and judgment:

102.    Declaring that the provisions of and enforcement of Idaho H.B. 264 by Defendants as discussed above, as applied to Plaintiffs' use of restrooms, violates Plaintiffs' rights as transgender people under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

103.    Declaring that the provisions of and enforcement of Idaho H.B. 264 by Defendants as discussed above, as applied to Plaintiffs' use of restrooms, violates Plaintiffs'

rights as transgender people to privacy under the Fourteenth Amendment to the United States Constitution;

104.     Declaring that the provisions of and enforcement of H.B. 264 by Defendants as discussed above, as applied to Plaintiffs' use of restrooms, violates Plaintiffs' rights as transgender people under Title IX and Title VII;

105.     Preliminarily and permanently enjoining Defendants from applying H.B. 264 to bar Atlas from men's restrooms at Boise State University, and preliminarily and permanently enjoining Defendants from barring Sophie from women's restrooms at the University of Idaho;

106.     Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

107.     Awarding nominal damages of $1 for violations of Title IX and Title VII only, as well as Plaintiff's costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

108.     Awarding such other relief as the Court deems just and proper.

109.     The declaratory and injunctive relief requested in this action is sought against each Defendant; against each Defendant's officers, employees, and agents; and against all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

DATED:  July 25, 2025              Samuel L. Linnet
                                   ALTURAS LAW GROUP, PLLC


                                   By:     /s/ Samuel L. Linnet
                                       _____

# Exhibit A

LEGISLATURE OF THE STATE OF IDAHO

Sixty-eighth Legislature                    First Regular Session - 2025

IN THE HOUSE OF REPRESENTATIVES

HOUSE BILL NO. 264, As Amended in the Senate

BY WAYS AND MEANS COMMITTEE

1        AN ACT
2   RELATING TO PROTECTING THE PRIVACY OF WOMEN; AMENDING TITLE 67, IDAHO CODE,
3       BY THE ADDITION OF A NEW CHAPTER 98, TITLE 67, IDAHO CODE, TO DEFINE
4       TERMS, TO ESTABLISH PROVISIONS REGARDING SAFETY AND PRIVACY IN COVERED
5       ENTITIES, AND TO PROVIDE FOR REMEDIES; PROVIDING SEVERABILITY; AND
6       DECLARING AN EMERGENCY AND PROVIDING AN EFFECTIVE DATE.

7   Be It Enacted by the Legislature of the State of Idaho:

8       SECTION 1. That Title 67, Idaho Code, be, and the same is hereby amended
9   by the addition thereto of a NEW CHAPTER, to be known and designated as Chap-
10  ter 98, Title 67, Idaho Code, and to read as follows:

11                              CHAPTER 98
12                      PROTECTING THE PRIVACY OF WOMEN

13      67-9801.  DEFINITIONS. As used in this chapter:
14      (1)  "Changing room" means a room or area in which a person may be in a
15  state of undress in the presence of others, including a locker room or shower
16  room.
17      (2)  "Correctional facility" means a state correctional facility or lo-
18  cal correctional facility as defined in section 19-4201A, Idaho Code.
19      (3)  "Covered entity" means a correctional facility, domestic violence
20  shelter, juvenile correctional center, or state educational institution.
21      (4)  "Domestic violence shelter" means a state-operated facility that
22  provides services, including food, housing, counseling, and assistance to
23  victims of domestic violence or abuse and their minor dependent children in
24  this state.
25      (5)  "Female" has the same meaning as set forth in section 73-114, Idaho
26  Code.
27      (6)  "Juvenile correctional center" means any state-operated residen-
28  tial facility or facility operated pursuant to a contract with the state that
29  provides twenty-four (24) hour supervision and confinement for juvenile of-
30  fenders committed to the custody of the department of juvenile corrections.
31      (7)  "Male" has the same meaning as set forth in section 73-114, Idaho
32  Code.
33      (8)  "Multi-occupancy" means a space that is designated for use by mul-
34  tiple persons simultaneously.
35      (9)  "Restroom" means a room that includes one (1) or more toilets or
36  urinals.
37      (10) "Sex" has the same meaning as set forth in section 73-114, Idaho
38  Code.
39      (11) "Sleeping quarters" means a room with more than one (1) bed and in
40  which more than one (1) individual is housed overnight.

1   (12) "State educational institution" means the university of Idaho,
2   Lewis-Clark state college, Idaho state university, Boise state university,
3   the school for the deaf and the blind, and any public community colleges un-
4   der the general supervision, governance, and control of the state board of
5   education.

6   67-9802.   SAFETY AND PRIVACY IN COVERED ENTITIES. (1) Any covered en-
7   tity shall designate each multi-occupancy restroom, changing room, and
8   sleeping quarters for the exclusive use by either females or males.
9   (2) Every restroom, changing room, or sleeping quarters within a cov-
10  ered entity that is designated for females or males shall only be used by mem-
11  bers of that sex. No individual shall enter a restroom, changing room, or
12  sleeping quarters that is designated for females or males unless such indi-
13  vidual is a member of that sex.
14  (3) A covered entity shall take reasonable steps to provide individuals
15  with privacy in restrooms, changing rooms, and sleeping quarters from mem-
16  bers of the opposite sex.
17  (4) The provisions of this section shall not apply to an individual who
18  enters a restroom, changing room, or sleeping quarters designated for the
19  opposite sex in any of the following circumstances:
20  (a) To perform custodial services or maintenance;
21  (b) To render medical assistance;
22  (c) To provide law enforcement assistance or to supervise any arrestee,
23  detainee, or inmate in a custodial setting;
24  (d) To provide services or render aid during a natural disaster, a de-
25  clared emergency, or when necessary to prevent a serious threat to good
26  order or safety;
27  (e) To use a single-user facility designated for the opposite sex, if
28  such single-user facility is the only facility reasonably available at
29  the time of the person's use of the facility;
30  (f) To use restrooms, changing rooms, and sleeping quarters that have
31  been temporarily designated for use by people of that person's biologi-
32  cal sex;
33  (g) To provide coaching or athletic training during athletic events; or
34  (h) To accompany and render assistance to a person who is in need of as-
35  sistance when the person rendering assistance is:
36      (i) A family member or a legal guardian; or
37      (ii) The designee of the person in need of assistance and the de-
38      signee is not a member of the designated sex for the single-sex re-
39      stroom, changing facility, or sleeping quarters.
40  (5) Nothing in this section shall be construed to prohibit a covered en-
41  tity from:
42  (a) Adopting policies necessary to accommodate persons protected under
43  the Americans with disabilities act, young children in need of assis-
44  tance, or elderly persons requiring aid;
45  (b) Establishing single-occupancy restrooms, changing rooms, or
46  sleeping quarters or family restrooms, changing rooms, or sleeping
47  quarters; or

(c)  Redesignating a multi-occupancy restroom, changing room, or sleeping quarters designated for exclusive use by one (1) sex to a designation for exclusive use by the opposite sex.

(6)(a)  A state educational institution shall provide a reasonable accommodation to any student or employee who:

(i)   For any reason, is unwilling or unable to use a multi-occupancy restroom, changing room, or sleeping quarters designated for the person's sex; and

(ii)  Provides a written request for reasonable accommodation to the state educational institution.

(b)  A reasonable accommodation shall not include access to a restroom, changing facility, or sleeping quarters that is designated for use by members of the opposite sex while persons of the opposite sex are present or could be present.

67-9803.   REMEDIES. (1) An individual who, while accessing a restroom or changing room designated for use by such individual's sex, encounters a person of the opposite sex in such restroom or changing room shall have a private cause of action for declaratory and injunctive relief against the covered entity if the covered entity:

(a)  Provided the person permission to use a restroom or changing room of the opposite sex; or

(b)  Failed to take reasonable steps to prohibit the person of the opposite sex from using the restroom or changing room of the opposite sex.

(2)  An individual who is required by the covered entity to share sleeping quarters with a person of the opposite sex shall have a private cause of action for declaratory and injunctive relief against the covered entity.

(3)  All civil actions brought pursuant to this section must be initiated within two (2) years after the violation occurred.  An individual aggrieved under the provisions of this section who prevails in court may recover reasonable attorney's fees and costs from the offending covered entity.

SECTION 2. SEVERABILITY. The provisions of this act are hereby declared to be severable and if any provision of this act or the application of such provision to any person or circumstance is declared invalid for any reason, such declaration shall not affect the validity of the remaining portions of this act.

SECTION 3.  An emergency existing therefor, which emergency is hereby declared to exist, this act shall be in full force and effect on and after July 1, 2025.